No. 10,430.

SUCCESSION OF MRS. BRIDGET MURRAY, WIFE OF GEORGE GROVER.

1. An heir has the right to be discharged from the payment of his ancestor's debts, out of his own property, by abandoning the effects of his ancestor's succession to his creditors; the right of preserving the identity of his own property from that of his ancestor's succession; and the right of claiming out of the ancestor's succession the debts that are due to him therefrom—but to do so he must safeguard his acceptance of the succession, by a clear and distinct reservation of the benefit of inventory

2. A party, in offering written documents in evidence, has the right to restrict its effects as evidence to a definite purpose, and is not compelled to offer them for whatever they may be worth as evidence.

3. Articles 1591 and 1595 of the Civil Code employ the word "testaments" in its generic sense, and the law-maker intended it should convey the idea that the several formalities which are required in the confection of different testaments, must be observed therein respectively, and not collectively. The law does not make it the duty of notaries to state the qualifications of witnesses, in the sense of R. C. C. 1591, but it does make it their duty to state their qualifications, in the sense of R. C. C. 1578.

4. It is a sacramental requirement of a notary, that he shall make express mention of all formalities having been fulfilled, but not that they were done at one time and without turning aside to other acts. But only those formalities which are specified in Article 1578 are referred to.

APPEAL from the Civil District Court, for the Parish of Orleans. *Ellis*, J.

---

*Moïse & Cohn* and *Felix J. Dreyfous* for Appellant.

---

*A. J. Lewis* for Appellee.

---

Succession of Murray.

---

The opinion of the Court was delivered by

WATKINS, J. Mrs. Bridget Murray, wife of George Grover, died in the city of New Orleans, on the 16th of November, 1888, leaving a nuncupative testament, which was received by public act. This will is couched in the following terms, viz:

"*State of Louisiana — City of New Orleans.*

"*Be it known that on this ninth day of December, eighteen hundred and eighty-four.*

"*I, Alphonse Barnett, a notary public, in and for the city and parish of New Orleans, duly Commissioned and sworn did, at the request of Bridget Murray, wife of George Grover, proceed to her residence at the corner of Bienville and Burgundy streets, in the second district of this city, where I found the said Mrs. Grover, sound in mind, memory and understanding, as she appeared to me, notary, and the witnesses hereinafter named and undersigned, and she requested of me, notary, to receive her last will and testament, as follows, to-wit:*

"*My name is Mary Bridget Murray, and am a resident of this city.*

"*I have no father or mother living and no children.*

"*I give and bequeath to my husband George Grover, the whole of my property, movable and immovable, I may die possessed of.*

"*I appoint my said husband George Grover, my testamentary executor, with seizin of my estate.*

"*I revoke all wills and testaments heretofore made by me.*

"*It is thus that the foregoing will was dictated to me, notary, by the testatrix to the undersigned notary in presence of said witnesses, and the undersigned notary did write it down as dictated by said testatrix in presence of said witnesses, and lecture of said will as dictated and written having been given by the undersigned notary in a loud and intelligible voice, to the said testatrix in presence of said witnesses, as she declared to me, notary, in presence of said witnesses, that it contained her last will and testament in which she persists, the whole was done at one time without interruption or turning aside to other acts, in the presence of said witnesses, who have signed their names with said testatrix and me, notary, the witnesses hereto being Robert (Reuben) T. Wheeler, Joseph Paillet and William S. Mackey, residing in this city and of lawful age. The name of Robert erased and that of Reuben interlined appd before signing the name of Mary interlined also appd before signing.*

MARY GROVER.
REUBEN T. WHEELER.
JOSEPH PAILLET.
WM. S. MACKEY.
A. BARNETT, Not. Pub.*"

One J. G. Spor, upon allegation and proof of the incapacity of the universal legatee appointed in said will, to accept and perform the functions of executor, applied for and obtained the probate of the will, and procured an order of court placing said universal legatee in possession of the property of the deceased. Thereupon Mrs. Margaret Torregano, alleging herself to be the surviving sister of the deceased, of the full blood, and her sole legal heir, in the absence of both descendants and ascendants, instituted this suit for the revocation of the will, on the ground that it contains certain radical defects of form, which vitiate it, and make it an absolute nullity, and therefore *void*.

The various alleged defects in the will are set out with great particularity and *in extenso* in the petition, but as they are succinctly summarized in plaintiff's brief, we quote them, viz :

" 1. It was not received by said notary in the presence of three witnesses, of lawful age and residing in this place, and otherwise competent as required by law.

" 2. It was not written by said notary as it was dictated and in the presence of the said three witnesses.

" 3. It was not read by said notary to said testatrix in the presence of the same three witnesses.

" 4. It was not signed by the testatrix in the presence of the same three witnesses and the said notary.

" 5. It was not signed by the same three witnesses.

" 6. The act states the testatrix to be '*Bridget Murray, wife of George Grover*,' and further states that she dictated to the notary her name to be '*Bridget Murray*,' whilst the act is not signed with that name, but is signed '*Mary Grover*,' an entirely different name.

" 7. The interlineation of the word '*Mary*' before the word '*Bridget*,' on the first page of said act, was made after the signing and conclusion of the will, as is shown by the interlineation running irregularly between the ruled lines of the writing paper, and the scrawled signature '*Mary Grover*' and was neither dictated nor approved by the testatrix.

" 8. The erasure of the word '*Robert*,' and the interlineation of the word '*Reuben*,' were not approved by the testatrix, and show two different persons and appearing at different times, and of whom only one has signed his name.

" 9. The three persons who signed their names are not the three witnesses referred to in the caption or at the end of the will, and were not all present as witnesses when the will was received, dictated, written and signed, continuously ; and the act does not show who were the three witnesses.

"10.   The act does not make proof by itself of a strict compliance with all the legal requisites, but does show on its face all of said illegalities.

"11.   All the legal requisites were not done at one time, without interruption and without turning aside to other acts, and such formalities as were observed, were done at different times."

We will discuss these various objections *seriatim*, and in the order foregoing.

### I.

Preliminary to the discussion of the merits are the exceptions of George Grover, beneficiary under the mooted will, and two bills of exceptions retained by him, during the trial.

*(a.)*   The exceptions are:   First, that the petition contains inconsistent demands, and fails to aver any injury as resulting from the alleged errors in the copy of the will; second, that it is vague, general and indefinite; third, that is shows no cause of action; fourth, that the plaintiff must either accept or reject the succession of the deceased, absolutely and unequivocally; and in case she accepts, such acceptance must be with, or without the benefit of an inventory; and she cannot assume an equivocal position, so "as to receive, if there is anything to receive, and yet not be liable if there is any liability."

These exceptions were overruled by the judge *a quo*, and the language of the petition, though somewhat guarded, is sufficient for his so doing. It is that the petitioner "is the sole legal heir of said deceased, (and) that, in so far as she may have any right to do so, (she) accepts the succession of said deceased with the benefit of inventory," &c.

This is followed by a prayer to the effect that the will and its probate be annulled and set aside, and "that petitioner be recognized as the sole legal heir of said deceased, under the benefit of inventory, and, as such, entitled to the entire estate of said deceased, after the payment of debts, if any there be," &c.

The object had in view by the petitioner was, doubtless, to preserve the benefit of being liable for the charges and debts of the succession only to the value of the succession effects.   R. C. C. 1032, 1054.

The code defines "succession" to be the transmission of the rights and obligations of the deceased to the heirs.   R. C. C. 871.

It is matter of no consequence whether the property exceed the charges; or the charges exceed the property, or whether the deceased left charges without property.   R. C. C. 872.

The right of an heir to be discharged from the payment of his ancestor's debts out of his *own* property, by abandoning the effects of his

ancestor to his creditors; the right of preserving the identity of his own property; as well as the right of claiming out of the ancestor's succession the debts that are due to him from it—are all valuable rights, and petitioner had the clear legal option to safeguard them as she did, in accepting it.

(b.) The demands of her petition are all of like tenor, and tend to the same conclusion, the nullity of the will. They do not assail the will for any *inherent* defects, but are, that it is null for vices of *form*. They appear to us to be perfectly consistent, and free from ambiguity, and set out a cause of action.

(c.) The defendant's exceptions are taken to the rulings of the judge in permitting the plaintiff to *restrict* the effect of certain written instruments offered in evidence, to a definite purpose; his position being "that the documents must go in for all they are worth as evidence."

It is elementary that a written instrument is only binding upon parties and persons to it, and third persons are not estopped from assailing, or contradicting its recitals.

In this instance plaintiff's claim is that Bridget Murray's will is null, and she is her sole heir. If it were true that the plaintiff was bound to offer and file the will "for all it is worth as evidence," and could not be permitted to restrict the offer to a certain purpose, that would be an end of the case; because it is a fundamental rule of evidence that a party is bound by the testimony he places on record in his own behalf.

Plaintiff had the undeniable right to offer the will for the purposes of *rem ipsam*, as the commencement of proof, and with a view of exhibiting to the court its defects and informalities. If this were not a correct rule of evidence, how could fraud or simulation in written contracts be shown, by parol evidence. We think the judge *a quo* ruled correctly.

II.

The judge of the lower court maintained the plaintiff's first ground of objection to the will, annulled it, and held her to be Bridget Murray's sole legal heir, and, as such, entitled to be placed in possession of the property left at her demise.

From his elaborate and carefully considered opinion, it appears that he rested his conclusions upon what was said on this subject in the Succession of Vollmer, 40 Ann. 597, and Weick vs. Heine, 41 Ann. ——, and the various authorities therein cited.

The *gravamen* of the judge's opinion is contained in the following paragraph, viz:

"In this case, the legal capacity of the three witnesses named, appears only from the declaration of the notary, the witness hereto * * residing in this city, and of lawful age. It is true the names Reuben, Joseph, and William indicate males, but there is nothing to indicate their age as being over sixteen years, or that they are not insane, or deaf, or dumb, or blind; or that they are capable of exercising civil functions, unless we accept, as such indication, the declaration of the notary that they reside in this city, and are of lawful age.

"Under the decisions above quoted, the notary is not the judge as to these requirements, and, on the pain of nullity, it was his duty to mention explicitly the qualifications of the witnesses, in order that same might be determined by the court in the probate and execution of the will. Age and residence are only two of the seven qualifications required by law for nuncupative testaments, and nothing can be left to inference, or proof *de hors* the face of the will itself."

As a foundation on which to rest this proposition, the judge previously announced the opinion that "the nuncupative will by public act, must make, of itself and on its face, full proof that every requirement of the law for the execution of testaments in this form, has been complied with.

"One of the requirements of the law is that the three witnesses, in whose presence the will must be received and executed, and who must sign the act, *shall have the legal capacity defined in R. C. C.* 1591, * * 1592 *and* 1594."

We are of the opinion that our learned brother of the lower court has mistaken the true import of R. C. C. 1591, *et sequentes.*

In Vollmer's Succession *ante,* we said of the testament under consideration — which was in nuncupative form, by public act:

"The charge against it is, that it does not set forth that the three witnesses are *residents* of the parish of Orleans, but that they are *competent* witnesses.

"The omission is fatal. The notary is required, under pain of nullity of the *act*, to express specifically every material fact constituting the competency of himself, and of the officiating witnesses, under the law, in that respect, and also of every formallity observed in the execution of the will. The *act* must make full proof, on its face, of every element necessary to its validity, as no evidence is admissible to supply any deficiency."

The language in which that opinion is couched is carefully selected,

and pertinent to the question under consideration, and it was, whether the will was valid *in that particular form*; for, though it might have been invalid as a nuncupative testament received by *public* act, it might have been valid in some other form. R. C. C. 1590.

As it was a question of *form*, only, we must look to the articles of the Code which prescribe the essential formalities for this particular kind of testament. Now we find in Article 1578 this declaration :

" The nuncupative testaments by public act, must be received by a notary public, in the presence of three witnesses residing in the place where the will is executed, or of five witnesses not residing in the place.

" This testament must be dictated by the testator, and written by the notary, as it is dictated.

" It must then be read in the presence of the witnesses.

" Express mention is made of the whole, observing that all *those formalities*, must be fulfilled at one time, without interruption, and without turning aside to other acts." R. C. C.

The guarded language of our opinion in Vollmer's succession, was aptly chosen, and properly limited to the question of the special qualification of witnesses to a nuncupative testament by public act, on the score of their residence in the place where same was executed, that being the only one involved in that case. Hence we said that the notary is required " to express specifically every material fact constituting the competency of himself, and of the officiating witnesses under the law, *in that respect*, and, also, every formality observed in the execution of the will." (Italics are ours.)

There is no other *formality* in the execution of a nuncupative will by public act, than those enumerated in R. C. C. 1578.

In Weicke vs. Heine, we merely quoted what was said on this subject in Vollmer's succession, with approval, without announcing anything new or additional; for that was a similar case.

It will be observed that the articles of the Code succeeding 1580 treat of nuncupative testament under private signature, the mystic or sealed testament, and the olographic testament, and designate the requisites of each.

They are followed by articles containing general provisions which are applicable alike to all. Among this number is article 1591, which declares that certain designated persons "are absolutely incapable of being witnesses to testaments " — not to the nuncupative testament by public act, alone, but to testaments, in general.

In this and subsequent articles the plural noun " testaments," is employed in a generic sense, to indicate the applicability of the principle to

*all;* and the provisions of article 1595 must be so construed, for it declares that " the formalities to which *testaments* are subject by the provisions of the present section must be observed, otherwise the *testaments* are null and void."

We think it erroneous to conclude, therefrom, that, in order to be valid, a nuncupative testament received by public act, should circumstantially recite full compliance with *all* the formalities that are prescribed in that section ; on the contrary, we think such a testament would be, utterly, null and void, if it did recite them all. For instance, article 1588 provides, that the olographic testament, " in order to be valid, must be entirely written, dated and signed by the testator."

That is one of the formalities to which testaments are subject by the provisions of that *section*, yet it is completely at variance with those required for the validity of nuncupative testaments received by public act, which are likewise provided by that section.

This is sufficient to show that article 1595 employs the word "testaments " in its generic sense, and that the law-giver intended it should convey the idea, that the several formalities which are required in the confection of different testaments, must be observed therein *respectively, and not collectively.*

Article 1591 is in the same category, and it is clear to our minds that it does not specify any *formality* to which testaments are subject, but simply declares what persons are absolutely incapable of being witnesses to testaments, in general. If this article has received a proper interpretation at the hands of our learned brother of the lower court, the law has entailed upon notaries a great hardship—the performance, indeed, of an utter impossibility—in requiring that, on pain of nullity, they shall specifically state, in acts executed by them, all the facts which tend to *negative the disqualifications* of witnesses mentioned in that article. For, how could a notary know that a witness was more or less than sixteen years of age ; or was so deaf, dumb, blind or insane, that he was incapable of being a witness to a testament ? By what means could he determine, what persons are disqualified by the criminal law from exercising civil functions ?

Such an interpretation was certainly not intended by our opinion in Vollmer's Succession. When it said that " the notary is required, under pain of nullity of the act, to express specifically every *material fact* constituting the competency  *  *  of the officiating witnesses, under the law, in that respect," it was not intended to convey the idea, that it was the duty of the notary to state " every material fact " constituting their

competency in *every* respect; or that he should state "every material fact" necessary to negative their *disqualification* in *every* respect.

Suffice it to say, broadly, that the law does not make it the duty of notaries to state the qualifications of witnesses in the sense of R. C. C. 1591; but it does make it their duty to state their qualifications in the sense of R. C. C. 1578.

## III.

The recitals of the will are as follows, viz.: "And the undersigned notary did write it"—the will—"down, as dictated by said testatrix, in presence of said witnesses." This statement fully answers plaintiff's second charge, and satisfies the law in this regard.

## IV.

The recitals of the will are further to the effect that "*lecture* of said will, as dictated and written, having been given by the undersigned notary, in a loud and intelligible voice, to the said testatrix, in the presence of said witnesses," etc.; and they answer the third charge, and likewise satisfy the law. The word "*lecture*" is to be understood in the sense of reading. That is the English of it.

## V.

The will further recites that "the whole was done. * * in the presence of said witnesses, who have signed their names, with said testatrix, and me, said notary." This recital sufficiently answers the plaintiff's fourth charge, and, also, the law.

## VI.

The plaintiff's fifth charge against the will is, that it is signed by *Mary Grover*, as testatrix, whilst the body of the act states the testatrix to be *Bridget Murray, wife of George Grover*, an entirely different person, to all appearances.

The act states that, "I, Alphonse Barnett, a notary public, did, at the request of *Bridget Murray, wife of George Grover*, proceed to her residence * * where I found the said *Mrs. Grover* * * as she appeared to me, notary, and the witnesses, * * and she requested me, notary, to receive her last will and testament as follows, to-wit: My name is Bridget Murray * * I give and bequeath to *my husband, George Grover*, the whole of my property * * I appoint my said husband, George Grover, my testamentary executor, etc."

From the foregoing recitals it is clear that "*Bridget Murray, wife of George Grover*, and *Mrs. Grover*," are one and the same person. Then we have "*Bridget Murray*" for the maiden name of the testatrix, and

*Grover*, the name of her husband. But the original act shows the interlineation of the name " *Mary* " before " *Bridget*," and the sentence made to read thus: " My name is *Mary Bridget Murray*," or *Mary Bridget Grover*, she being the wife of George Grover. Now, it may be perfectly true that the testatrix, at first, dictated her name as "Bridget Murray, wife of George Grover," yet when it was read to her in the presence of the witnesses, she, doubtless, invited the notary's attention to the fact that her full maiden name was *Mary Bridget Murray;* and, in affixing her signature to the act, she, doubtless, appended that of " *Mary Grover*," as the one by her most used during her married life, instead of her maiden name. In full confirmation of that fact, we find it stated in the body of the will, *and immediately over the signature*, " *Mary Grover*," these words, viz. : " The name Mary interlined, also, appended before signing." We do not think there is any reasonable doubt of the fact that " Bridget Murray, wife of George Grover," " Mrs. Grover," " Mary Bridget Murray," and " Mary Grover," are the names of one and the same person.

This objection of plaintiff is not good.

### VII.

The charge that the interlineation of the word *Mary*, before the word *Bridget*, on the first page of the act, was made after the signing and conclusion of the will is not borne out by a close inspection of the will, which is before us in the original. Preceding the commencement of the clause of the will, viz. : " My name is, etc.," there is an entire line left blank, and, in this space, the name " *Mary* " is clearly and distinctly written, and it does not bear the appearance suggested.

### VIII.

The charge that the erasure of the name *Robert*, and the interlineation of the name *Reuben*, were not approved by the testatrix, and show two different persons, who appeared at different times, and of whom only *one* has signed his name is not borne out by the record.

In the beginning of the act the notary states that Mrs. Grover appeared to him "*and the witnesses hereinafter named and undersigned;*" and, at the conclusion, their names appear to have been originally stated to be " Robert T. Wheeler, Joseph Paillet and William S. Mackey ;" but the name *Robert*, in the original act appears to have been subsequently erased and that of *Reuben* interlined. After stating the names and resi-

dence of the witnesses, but before the signatures of the testatrix and witnesses, we find this announcement, viz.:

" The name of *Robert* erased and that of *Reuben* interlined, appd. before signing, the name of *Mary* interlined, also appd. before signing." This affirmative declaration that this erasure and interlineation occurred *before the signing* is conclusive proof that the *subsequent* affixing of the testatrix' signature to the will is an approval of it. Independent of the written declaration of the fact, the subsequent signing is a conclusive evidence of her approval.

## IX. AND X.

These two charges are substantially embraced in and discussed under different, preceding paragraphs. The significance of these objections is that, in plaintiff's view, the three witnesses who signed the act are not the *same* three witnesses who are mentioned in the act. This is merely a verbal criticism, or play on words, growing out of the erasure of the name *Robert* and the substitution and interlineation of Reuben therefor.

They are without merit.

## XI.

The final charge is that all the legal requisites were not done at one time, and without turning aside to other acts.

It is a sacramental requirement of the notary that he shall make "express mention * * of the whole," but not that he shall *declare* that all those formalities had been "fulfilled at one time, and without turning aside to other acts." R. C. C. 1578. His failure to make such a declaration in the will, is not a ground of nullity. 7 La., 599; 12 R. 639. That article only refers to the formalities which are therein mentioned. All of those formalities seem to have been fulfilled at one and the same time; and the act furnishes no proof that he turned aside to other acts. There is no evidence of his having prepared any other act. This charge must share the fate of its predecessors.

A consciencious and pains-taking examination of the law and evidence appertaining to this case, has brought us to the conclusion that the judgment appealed from is erroneous and should be reversed.

It is therefore ordered and decreed, that the judgment appealed from be and the same is annulled and reversed; and it is now ordered and decreed that the demands of plaintiff and appellee be rejected at her cost in both courts.